IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED TRANSPORTATION UNION, ) <br> ) <br> **Plaintiff,** ) <br> ) <br> vs. ) <br> ) <br> THE ALTON & SOUTHERN RAILWAY ) <br> COMPANY, THE BURLINGTON ) <br> NORTHERN SANTA FE RAILWAY ) <br> COMPANY, CSX TRANSPORTATION, ) <br> INC., THE KANSAS CITY SOUTHERN ) <br> RAILWAY COMPANY, ) <br> MANUFACTURERS RAILWAY ) <br> COMPANY, NORFOLK SOUTHERN ) <br> CORPORATION, TERMINAL RAILROAD ) <br> ASSOCIATION OF ST. LOUIS, and UNION ) <br> PACIFIC RAILROAD COMPANY, ) <br> ) <br> **Defendants.** ) | CIVIL NO. 05-190-GPM |

## **MEMORANDUM AND ORDER**

**MURPHY, Chief District Judge:**

This case involves a labor dispute between United Transportation Union (UTU) and a coalition of freight railroads (Defendant Carriers) regarding two notices served on UTU under Section 6 of the Railway Labor Act (RLA), 145 U.S.C. § 156, (Section 6 Notices) by Defendant Carriers' agent, the National Carriers' Conference Committee (NCCC). For purposes of collective bargaining with their employees, Defendant Carriers generally bargain together as a multi-employer group and are represented by NCCC. This process is known as national handling. The current round of bargaining began November 1, 2004, with the exchange of Section 6 Notices between UTU and Defendant Carriers, and they have engaged in national handling of the issues raised by the

Notices; however, UTU maintains the impropriety of the two Section 6 Notices at issue in this case – the Staffing/Consolidation Proposal and the Joint Legislative Proposal. They state as follows:

Staffing/Consolidation

New technologies introduced over the last twenty years enable significant change in job content and design in railroad transportation. The safety and efficiency of railroad operations have been enhanced through these developments, and the benefits have flowed substantially to the shipping public and national economy overall. Present and emerging technologies promise productivity improvements that will advance this critical change process.

Despite recent volume and revenue growth, the industry still struggles to fund the enormous infusion of capital needed immediately to deliver service expected by our customers and to expand capacity essential to sustained growth. The railroads' current labor cost model (which still mandates staffing levels that require the employment of more people than are necessary to conduct the business and imposes above market wage and benefit costs) produces relentless labor cost inflation, and is incompatible with the industry's capital requirements over the period covered by the new bargaining round. Clearing the path for healthy capital investment through labor model reform will lead to steady business growth, new job opportunities in the long run, and a stronger, more balanced national transportation system. Moreover, the railroad industry's current demographics present a unique opportunity to effect such changes with minimal employee impact.

PROPOSED CHANGES:

A.    1.    All train and engine service positions shall be consolidated. The consolidated position shall be known as "transportation employee" and shall be governed by a common collective bargaining agreement.

       2.    Subsequent to consolidation, the work formerly performed separately by the train and engine service positions shall be performed by qualified transportation employees.

       3.    Concurrent with consolidation, crew size shall be based on operational needs as determined by the railroad.

       4.    Representatives of the railroad and of the transportation employees shall jointly negotiate an equitable distribution of the work among transportation employees. In the event the parties are unable to reach agreement, the matter shall be referred to final and binding arbitration.

    5.    Representatives of the railroad and of the transportation employees shall jointly negotiate an equitable protective arrangement in connection with these changes. In the event the parties are unable to reach agreement, the matter shall be referred to final and binding arbitration.

B.    Absent agreement on staffing/consolidation, to the extent that any collective bargaining agreement requires a crew size which exceeds operational needs, the compensation of the entire crew shall not exceed the compensation which would have been paid to the crew had crew staffing been determined by the railroad by the operational needs alone. Such reduced compensation shall be divided equally among the crew members.

<u>Joint Legislative Proposal</u>

The Federal Employers' Liability Act (enacted in 1908) governs compensation for on-the-job injuries in the railroad industry. The FELA is outmoded, counterproductive and should be replaced. Among the Act's many faults:

- It creates an adversarial relationship between employer and employee.

- Some injured employees get nothing while others receive excessive jury verdicts.

- An injured employee's negligence reduces and sometimes precludes any recovery.

- It encourages employees to stop working and creates disincentives for rehabilitation.

- It costs much more to administer than other injury compensation systems.

- Much of the excess cost unjustly enriches trial lawyers.

- It creates conflicts of interest for labor leaders that have resulted in corrupt practices.

Labor and management should act to protect the interests of injured employees by jointly drafting replacement legislation which avoids the shortcomings of FELA.

    PROPOSED CHANGES:

        1.    Develop a joint legislative proposal governing employee compensation for on-the-job injuries that replaces the traditional adversarial fault-based approach with constructive and safety-focused procedures and options designed to better address the costs and interests of railroads and employees, and which would provide employees with a share of the millions of dollars that now go annually to FELA trial lawyers.

        2.    If a joint legislative proposal described in #1 is not developed and enacted, all rates of pay will be reduced by an amount that represents the excess costs to the railroads attributable to FELA.

(Doc. 15, Ex. 1 to Declaration of Richard L. Marceau.)  UTU filed this action for declaratory and injunctive relief under the RLA asking the Court to determine its rights and obligations with respect to the Staffing/Consolidation and Joint Legislation Proposals.

      The RLA provides two distinct avenues for dispute resolution, each being dependent upon whether the dispute is categorized as major or minor. *Burlington N. R.R. v. UTU*, 862 F.2d 1266, 1271 (7th Cir. 1988).  The terms "major" and "minor" are judicially created and do not appear in the statute.  "Rather, the statute refers only to 'disputes concerning rates of pay, rules, or working conditions,' 45 U.S.C. § 151a(4) (major), and 'disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions,' 45 U.S.C. § 151a(5) (minor)."  *Id*. at 1271 n.4.  Major disputes are limited to those disputes that arise in the absence or silence of a collective bargaining agreement.  *Id*. at 1271.  These disputes cannot be resolved through interpretation or analysis of a collective bargaining agreement.  *Id*.  By contrast, minor disputes, which are more common, include all those disputes in which a collective bargaining agreement is involved in the resolution of the dispute.  While the interpretation or application of the agreement may be at issue in a minor dispute, the existence of a collective bargaining agreement is

undisputed. Therefore, "minor disputes cover all those disputes explicitly governed by the collective bargaining agreement, as well as those adopted by the agreement through practice and custom." *Id*. If the parties disagree as to whether reference to the collective bargaining agreement can resolve the dispute, the dispute is minor unless the carrier's interpretation is frivolous or obviously insubstantial. *Id*. at 1272-73.

The distinction between major and minor is crucial to determine how the dispute must be resolved under the RLA. Both major and minor dispute resolution procedures contemplate negotiations as the first step towards settlement. *Id*. at 1272. Major disputes ultimately can result in self-help; therefore, they are designed to be settled by the parties themselves through negotiation and mediation with the National Mediation Board. *Id*. During all of this, the parties are obliged to preserve the status quo. *Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 638 (7th Cir. 1998). Upon certain findings by the National Mediation Board, a Presidential Emergency Board (PEB) may be convened to make recommendations to the parties in an effort to avert self-help. 45 U.S.C. § 160. Because of these repercussions, if there is any doubt as to whether a dispute is major or minor, a court will construe the dispute to be minor. *Burlington N.*, 862 F.2d at 1272. By contrast, the procedure for resolving a minor dispute, if negotiation fails, is binding arbitration before the National Railroad Adjustment Board or a special adjustment board. *Id*.

UTU and Defendant Carriers have filed cross-motions for summary judgment. The parties agree that this case is ripe for disposition. The Court is confronted with only legal issues, as no material factual disputes have been presented. Accordingly, disposition under Federal Rule of Civil Procedure 56 is appropriate.

Staffing/Consolidation Proposal

UTU presents three alternative theories for relief in its challenge to the Section 6 Notice on staffing/consolidation. First, it argues that the issue of crew consist is not subject to national handling and asks the Court to declare, as a matter of law, that UTU has no obligation to bargain nationally with Defendant Carriers on any issue relating to crew consist. Second, UTU argues that if the issue were appropriate for national handling, it would constitute a major dispute, and a status quo injunction would be appropriate. This argument is based upon UTU's assertion that the promulgation of the Staffing/Consolidation Proposal constitutes a repudiation of local crew consist agreements that contain moratorium provisions. UTU argues that the Court can determine that the agreements are repudiated without having to interpret them; therefore, this is a major dispute. UTU also contends that, even if the parties disagree as to the major/minor categorization, Defendant Carriers' position that the Proposal is not barred is frivolous; therefore, the dispute is major. UTU seeks a status quo injunction pending resolution of the dispute. Third, and alternatively, UTU argues that even if the issue were appropriate for national handling and even if it is not a major dispute, it is at least a minor dispute because the terms of the crew consist agreements (minus the six that admittedly do not contain moratorium provisions) must be interpreted to determine whether the moratorium provisions bar the Staffing/Consolidation Proposal. UTU argues that its position is non-frivolous; therefore, if the Court finds the dispute to be minor, it should be submitted to an arbitrator to decide the scope of the moratorium provisions.

"The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of

mass bargaining on that point and of the historical experience in handling any similar national movements." *Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R. Co.*, 383 F.2d 225, 229 (D.C. Cir. 1967). In this case, as in *Brotherhood of Railroad Trainmen*, "history and realities of crew consist bargaining in this industry impel the conclusion that mass handling [is] not required by the statute for bargaining on that issue." *Id.*

In 1990, President George Bush appointed PEB 219 to investigate consolidated disputes, including crew consist, between multiple carriers and various unions, including UTU. UTU and Defendant Carriers devote considerable time to PEB 219, and the Court agrees that its Findings and Recommendations are instructive. The crew consist issue involved in PEB 219 is summarized as follows:

> The Carriers assert that the single most important labor cost problem is the huge expense of unneeded and unproductive ground service employees who are required under current crew consist agreements. … Although UTU has been invited to negotiate a new national crew consist agreement that would address the overmanning issue directly, the UTU has refused, claiming that crew consist must be handled locally and that some carriers are barred by local moratoriums from proposing crew consist changes.
>
> In the face of these objections, the Carriers have not insisted upon their crew consist proposal, although they continue to hold their invitation open. They do insist, however, that the parties address the cost of current overmanning which threatens the survival of the industry and thus the livelihood of all of its employees. Accordingly, in the absence of any proposal from the UTU, the Carriers propose a 20% reduction in wages for all ground service employees.

(PEB 219 Report, pp. 30-31.) In its Findings and Recommendations, PEB 219 stated:

> A central issue to the railroads is the level of manning of trains, referred to as crew consist. Historically, a crew consisted of an engineer, fireman, conductor and two or three brakemen. Over the years the parties have entered into agreements to eliminate the job of fireman and many carriers have entered into agreements to eliminate the second brakeman's position by attrition. However, from the Carriers' point of view, attrition has been too slow a method of obtaining manning efficiencies.

> Crew consist has always been bargained locally and has never been the subject of a national agreement. The UTU has taken the position here that it cannot become a national subject without UTU consent and the Carriers have implicitly recognized this by requesting either a wage reduction or, alternatively, a national crew consist agreement.
>
> The Board is of the view that the UTU position is the correct one and that crew consist, as such, is not appropriately before this Board. However, since the Carriers have made a valid proposal for a reduction in pay, which is before this Board, the Board believes that the parties' best interest would be served if it made some recommendations regarding the pay of UTU-represented employees in order to help to resolve the parties' longstanding impasse rather than simply dropping the matter on legal grounds.
>
> The Board does not believe that a wage reduction program as suggested by the Carriers should be undertaken. It also agrees with the UTU that crew consist cannot be handled nationally. On the other hand, it does believe that the matter must be bargained to resolution in 1991. Accordingly, the Board makes the following recommendations which should be part of the national agreement … .

(*Id*. at p. 66.) What happened after PEB 219 issued its Report is particularly important to put the parties' positions in this case into context. UTU was unable to resolve its differences with the Carriers, represented by NCCC, during an agreed-upon time period after the Report was issued, and UTU went on strike. The following day, Congress reacted to resolve the strike by passing legislation imposing the final report of PEB 219, subject to revision by another Special Board appointed by the President, as the collective bargaining agreement governing the parties. The Special Board ultimately denied all requests for modification; therefore, the unaltered final report was imposed on the parties. *UTU v. United States ex. rel. Burlington N. R.R. Co.*, 987 F.2d 784, 786 (D.C. Cir. 1993), *mandate recalled* June 30, 1993.

Defendant Carriers want the Court to consider the Staffing/Consolidation Proposal as three separate proposals: a consolidation of functions proposal; a crew size proposal; and an alternative and conditioned wage proposal. The Court does not read the proposal so limited but, rather, finds

that the consolidation of functions provisions involve, at their core, crew consist issues. Defendant Carriers themselves describe this proposal in their brief as the consolidation of functions of the employees who crew trains (Doc. 7, p. 10 of 20). Implicit in the consolidation provisions is the elimination of jobs/positions, which historically is a crew consist issue. Therefore, the Court rejects Defendant Carriers' argument that even if crew consist is not subject to national handling, UTU still must bargain over consolidation and wages. Under the proposal as written, consolidation is crew consist and must be handled locally.

Defendant Carriers are correct that the alternative wage proposal is a valid proposal for a reduction in pay. It is appropriately in national handling. UTU has asked for declaratory and injunctive relief with respect to crew consist issues only and argues that wages cannot be bootstrapped to the crew consist proposal to avoid the crew consist moratoria. While this may be a forceful policy argument, UTU cannot explain away PEB 219's finding that the conditioned wage proposal there, similar to this one, was valid. To repeat, in PEB 219, as here, UTU argued that crew consist must be handled locally and that some carriers were barred by local moratoria from proposing crew consist changes. PEB 219 acknowledged that crew consist should be handled locally but found the conditioned wage proposal to be valid. In other words, the wage proposal was unaffected by the local moratoria relating to crew consist. This Court finds PEB 219's finding on this issue persuasive. Accordingly, the Court will not use its authority to enjoin bargaining on wages pending local resolution of crew consist issues.

Defendant Carriers argue that, under the rationale of PEB 219, because they have made a valid proposal for reduction in pay, which is in national handling, the crew consist issues are subject to national handling. This is where the Court diverges from PEB 219 because of the different

functions of the Court and an Emergency Board.  UTU made it clear during the hearing that it seeks a declaration in this case because of what happened in PEB 219, and it does not want to let that happen again.  In other words, it is seeking a legal ruling that it failed to seek in 1991 in an effort to avoid the statutorily-imposed agreement that resulted.  This Court agrees with UTU's position.  UTU is not obligated to bargain nationally on issues related to crew consist, and this Court so finds.  UTU may agree to do so, but it cannot be forced to do so.  *See Brotherhood of R.R. Trainmen*, 383 F.2d at 229.

Based upon the facts presented, the long history of local negotiating of crew consist issues, and case law, UTU has no obligation to bargain with Defendant Carriers in national handling regarding the crew consist issues raised in the Section 6 Notice on Staffing/Consolidation submitted in November 2004 because the subject is local as a matter of law.  The Court declines to go a step farther, however, as urged by UTU, and find that *even if* Carrier Defendants' demands were served locally, they would violate the status quo provisions of the RLA.  What is before the Court is the service of Section 6 Notices in national handling, and the Court will not issue an advisory opinion as to local handling.  UTU wants it both ways:  it wants an order that the local issue cannot be handled nationally, but it also wants an advisory opinion as to how all of the local disputes are to be handled before there is a justiciable dispute.

<u>Joint Legislative Proposal</u>

Defendant Carriers' contention as to why this proposal is appropriate is two-fold:  (1) the first proposed change – to develop a joint legislative proposal – is a lawful, permissive subject of bargaining; and (2) the second proposed change involves wages and, therefore, is a mandatory subject of bargaining.  It is well-established that bargaining need not be confined to the statutory

subjects. *See NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958). However, non-mandatory subjects are enforceable only if the clauses are lawful, and if both sides agree to them. *Id*. It is lawful to insist upon matters within the scope of mandatory bargaining and unlawful to insist upon matters outside the scope of mandatory bargaining. *Id*.

UTU asks for a declaration that it has no obligation under the RLA to bargain with Defendant Carriers regarding the Joint Legislative Proposal. Defendant Carriers' argument regarding the first proposed change, *i.e.*, that the proposal is a permissive subject of bargaining, misses the mark. UTU wants a finding that this proposal is not subject to bargaining under the RLA, which covers "change[s] in agreements affecting rates of pay, rules, or working conditions," 45 U.S.C. § 156. The Court rejects Defendant Carriers' contention that because they have not yet insisted upon bargaining, this issue is not ripe for determination.[1] That is the point. UTU does not want to get to that point, and it should not get to that point because Defendant Carriers have no right to insist that UTU bargain on an issue outside the scope of mandatory bargaining. *Wooster*, 356 U.S. at 349. It is clear that UTU is entitled to a declaration that it is not obligated under the RLA to bargain on the first part of the Joint Legislative Proposal.

With respect to the second part of the proposal, Defendant Carriers contend that it is within the scope of mandatory bargaining because it includes a conditioned wage provision. The Court disagrees, despite the inclusion of the provision that "all rates of pay will be reduced by an amount that represents the excess costs to the railroads attributable to FELA," because that provision is contingent upon the development *and enactment* of a joint legislative proposal. UTU cannot

---

[1]Defendant Carriers have requested mediation with the National Mediation Board, and the Joint Legislative Proposal was included as an issue to be mediated (*see* Doc. 20, Ex. to Supp. Declaration of Kenneth Gradia).

determine with exactitude what Congress decides to pass as legislation, and the RLA does not contemplate the legislative branch being a party to the negotiating process. The Court recognizes that non-bargainability is a concept used sparingly. *See Brotherhood of R.R. Trainmen v. Akron & Barberton Belt R.R. Co.*, 385 F.2d 581, 601 (D.C. Cir. 1966). "We are concerned here with bargainability, and instinct in the essence of collective bargaining is a notion of mutuality, that if a subject is brought up each side has at least the authority both to offer and to concede." *Id*. at 603. Because Congress is not a party to the agreement, UTU, and Defendant Carriers for that matter, lacks the authority to agree to the proposal's enactment. Therefore, UTU has no duty to bargain on this provision, as it is non-bargainable under the RLA.

Motion for Leave to File Amicus Curiae Brief

The Rail Labor Bargaining Coalition (RLBC) moves for leave to file an amicus curiae brief in support of UTU's position on the Joint Legislative Proposal. RLBC contends that it is an appropriate amicus because it possesses a special interest in this action and matters asserted in its brief are relevant to final disposition of the issue. RLBC currently is in national handling with NCCC and has been presented with a Section 6 Notice containing the Joint Legislative Proposal. RLBC suggests that NCCC has insisted that RLBC bargain on the issue.

RLBC's motion for leave to file an amicus curiae brief (Doc. 23) is **DENIED**, and the brief (Doc. 24) is **STRICKEN**. RLBC is seeking a declaration that UTU has no statutory obligation to bargain with Defendant Carriers regarding the Joint Legislative Proposal to help its own bargaining position. The Court does not need any more briefing on this issue.

Defendant Carrier's Motion for Summary Judgment

With respect to the crew consist issue, Defendant Carriers argue that because the moratoria

on their face do not bar the Staffing/Consolidation Proposal, UTU's position is frivolous; therefore, Count I should be dismissed. Defendant Carriers argue that the non-mandatory provision of the Joint Legislative Proposal is lawful as long as they do not insist on bargaining to impasse and, because no such insistence has been made, UTU's claim should be dismissed. They further argue that the second provision of the Joint Legislative Proposal is a mandatory subject of bargaining because it includes a wage proposal. The Court rejected these arguments above, except with respect to refusing to enjoin bargaining on Defendant Carriers' wage proposal. Accordingly, Defendant Carriers' motion for summary judgment (Doc. 6) is **GRANTED in part and DENIED in part**.

Conclusion

For the foregoing reasons, Defendant Carriers' motion for summary judgment (Doc. 6) is **GRANTED in part and DENIED in part**. UTU's motion for summary judgment (Doc. 14) is **GRANTED in part and DENIED in part**, and the Court declares as follows: UTU has no obligation to bargain nationally with Defendant Carriers regarding issues related to crew consist raised in the Staffing/Consolidation Proposal. UTU has no obligation under the RLA to bargain on the Joint Legislative Proposal, as the first provision is non-mandatory and the second provision is non-bargainable. UTU requests costs and attorney fees incurred in this proceeding, but the Court finds no basis for such award; accordingly, the request is **denied**. Finally, RLBC's motion for leave to file an amicus curiae brief (Doc. 23) is **DENIED**, and the brief (Doc. 24) is **STRICKEN**.

**IT IS SO ORDERED.**

DATED: 03/10/2006

s/ G. Patrick Murphy<br>
G. PATRICK MURPHY<br>
Chief United States District Judge